# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AKWELEY ABLORH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 23-11937-MJJ |
| ) | |
| TOWN OF STONEHAM, DAVID ) | |
| STEFANELLI, SHERYL ROTONDI, & ) | |
| BRIAN RAFFAELO, ) | |
| ) | |
| Defendant. ) | |
| | |

## <u>MEMORANDUM OF DECISION</u>

November 20, 2025

JOUN, D.J.

Plaintiff Akweley Ablorh ("Plaintiff") alleges that she was tricked by multiple Stoneham police officers into presenting herself for a psychiatric evaluation, which purportedly resulted in her involuntary hospitalization and the eventual temporary loss of custody of her child. *See* [Doc. No. 1-3 at ¶¶ 58–80]. Plaintiff brings two causes of action against defendant Town of Stoneham (the "Town") and nine causes of action against three defendant police officers thereof, David Stefanelli ("Stefanelli"), Sheryl Rotondi ("Rotondi"), and Brian Raffaelo ("Raffaelo") (collectively, "Defendant Officers"), (altogether, the "Defendants") for injuries allegedly sustained as a result of the events leading up to and following Plaintiff's hospitalization. *See generally* [Doc. No. 1-3].

Defendants filed a motion for summary judgment on all claims on June 30, 2025. *See generally* [Doc. No. 48]. For the foregoing reasons, the motion is <u>GRANTED</u>.

## I.    PROCEDURAL HISTORY

Plaintiff, at the time represented by counsel, filed her complaint in Middlesex Superior Court on June 14, 2023 (Civil Docket No. 2381CV01765). [Doc. No. 4]. Shortly thereafter, on August 23, 2023, the matter was removed to this Court. [Doc. No. 1]. Defendants filed an answer on September 12, 2023. [Doc. No. 5]. On March 26, 2025, Plaintiff's counsel withdrew representation. [Doc. No. 43]. From that point on, Plaintiff has proceeded *pro se*.

Defendants filed a motion for summary judgment on all claims on June 30, 2025. [Doc. No. 48]. On July 8, 2025, Plaintiff filed a one and a half-page opposition that did not contain any citations to case law or the record. *See generally* [Doc. No. 52]. Plaintiff was permitted to refile and did so on July 25, 2025. [Doc. No. 58]. Plaintiff's second opposition identifies "at least 10 significant factual disputes requiring a hearing in this case" but does not contain any citations to the record in support of the alleged disputes. *See generally* [*id.*]. Plaintiff also did not submit a formal response to Defendants' statement of material facts or file her own statement of material facts. *See* [Doc. No. 58 at 10]. Defendants were permitted to file a reply but did not do so. *See* [Doc. No. 55].

## II.    BACKGROUND

The following facts, unless otherwise noted, are either undisputed or recounted in the light most favorable to Plaintiff, the non-moving party. *See Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 108 (1st Cir. 2024).

On the morning of June 14, 2020, Plaintiff contacted the non-emergency line of the Stoneham Police Department to report "minor injuries" on herself, her three-month-old child, and her property, which she believed were caused by her then-husband. [Doc. No. 50 at ¶¶ 8–9]. Plaintiff's phone call was transferred to police officer Stefanelli, and they discussed her concerns.

[*Id.* at ¶¶ 10–15]. During that call, Plaintiff informed Stefanelli that "she has unexplained minor injuries and believes that her husband who is often up at night inflicts these minor injuries on her and their son. She stated that some of the scratches are fresh and some have heeled [sic] and have left a scar but they are very minor." [Doc. No. 48-4 at 2]. She also stated that her husband cuts her fingernails into a "jigsaw pattern" while she sleeps and that she believes he twists her wrists in the process because they are sore when she wakes up. [*Id.*]. She further stated that her husband branded her phone with a triangle "punch" mark and claimed her husband pushed her a couple times but admitted there was no history of violence. [*Id.*].

Plaintiff testified that she had been sleeping in a separate room as her husband for "several weeks" leading up to her phone call to the police department. [Doc. No. 48-8 at 8]. According to Stefanelli's written police report, during their phone conversation, Plaintiff "stated that she has been 'barricading in our nursery' with the baby because she feared what he[r husband] may do" at night. [Doc. No. 48-4 at 2]. Plaintiff now disputes whether she used the term "barricade" to describe her sleeping situation at home, suggesting that only her husband used that descriptor, but she concedes that, at a minimum, she "hung something noisy on the doorknob" as an alert mechanism because she "was not comfortable with him entering the room while [she] was sleeping." [Doc. No. 48-8 at 8–9]. Stefanelli testified that Plaintiff "was very calm and articulate with her descriptions and believable" and that she was describing "a domestic violence situation." [Doc. No. 48-5 at 15; Doc. No. 50 at ¶ 14]. Plaintiff claimed she was afraid of her husband and agreed to have Stefanelli and a few other officers come to her house to evaluate the situation. [Doc. No. 48-4 at 2].

The Defendant Officers arrived at Plaintiff's house later that same morning. [Doc. No. 50 at ¶ 18]. Plaintiff showed the Defendant Officers the alleged injuries to her phone, fingernails, and

son upon their arrival. [*Id.* at ¶¶ 19, 21, 32]. Stefanelli reported that the damage to Plaintiff's phone appeared "very typical of minor wear" and was "so miniscule that you could barely see it." [Doc. No. 48-4 at 2]. According to Stefanelli, there were "no marks like anything she described on the phone," he had to "ask to see her fingernails," and the "injuries [to her son] were extremely minor and typical with tiny scratches that would be normal for an infant." [*Id.*]. In fact, Plaintiff concedes that the scratches and scars on her son's cheeks were "barely visible." [Doc. No. 50 at ¶ 22; Doc. No. 48-6 at 6]. Stefanelli reported that other aspects of Plaintiff's story, as she relayed them to him during their earlier phone call, were unsubstantiated based on what he observed during the at-home visit. *See* [Doc. No. 50 at ¶¶ 23–25].

According to Plaintiff's husband, Plaintiff had become "paranoid" of him being around their child, and she had been limiting his access to their child to just ten to fifteen minutes of supervised time each day. [*Id.* at ¶ 33; Doc. No. 48-9 at 2]. Plaintiff's husband also told one of the Defendant Officers about her past trauma and history of depression. [Doc. No. 48-9 at 2-4; Doc. No. 50 at ¶¶ 27–30].

The Defendant Officers conferred and agreed that Plaintiff might be suffering from mental health issues and should be evaluated by a medical professional. [Doc. No. 50 at ¶ 35]. Stefanelli encouraged Plaintiff's husband to call her physician to discuss whether involuntary hospitalization pursuant to Mass. Gen. Laws ("M.G.L.") ch. 123, § 12 ("Section 12") was appropriate. [*Id.* at ¶ 34; Doc. No. 48-5 at 42–43]. Stefanelli testified that Plaintiff's husband called but was unable to reach the physician, and thereafter the Defendant Officers devised a plan to get Plaintiff and her child to Melrose-Wakefield Hospital ("MWH"). *See* [Doc. No. 48-5 at 44–46]. According to Plaintiff, the Defendant Officers told her that she needed to have her child evaluated at the hospital if she wanted to pursue a restraining order against her husband and suggested she bring her son to

MWH. [*Id.* at 65]. Plaintiff agreed it was a good idea to have her son evaluated at the emergency department and drove her son to MWH in her personal vehicle. [*Id.* ¶ 4; Doc. No. 48-5 at 67–68]. Stefanelli and Rotondi followed Plaintiff to the hospital in their own respective vehicles. [*Id.*].

Raffaelo stayed at the house with Plaintiff's husband while Plaintiff, Stefanelli, and Rontondi went to the hospital. [Doc. No. 48-9 at 4]. Stefanelli told Raffaelo that he was going to advise Plaintiff to go to the hospital "to be evaluated and possibly sectioned" and that Raffaelo "should . . . make contact with DCF." [*Id.*]. After wrapping up at Plaintiff's home, Raffaelo returned to the police station, where he did eventually contact DCF and share his "concerns and what had taken place." [*Id.*].

The Defendant Officers admit that they did not inform Plaintiff that they suspected she was suffering from mental health issues or that they intended to inform hospital staff of their suspicions once they arrived at MWH. [Doc. No. 48-5 at 67–68]. Unbeknownst to Plaintiff, the Defendant Officers had also contacted the Department of Children and Families ("DCF") to investigate the child's wellbeing and instructed DCF to respond directly to the hospital. [Doc. No. 48-9 at 4].

Once at the hospital, Stefanelli helped Plaintiff check in her son for evaluation. [Doc. No. 50 at ¶40]. Plaintiff and her son were then brought into an exam room, after which point none of the Defendant Officers saw Plaintiff or her child again. [*Id.* at ¶¶ 40–44]. Stefanelli then briefed certain hospital staff of his concern for the mother's mental state and relayed details from his phone conversation with Plaintiff as well as his at-home visit. [*Id.*]. According to Raffaelo's police report, hospital staff had requested that DCF go to the hospital directly rather than to Plaintiff's home. [Doc. No. 48-9 at 4]. Stefanelli conveyed this request to Raffaelo, who was still on the phone with DCF and capable of relaying the hospital's request. [*Id.*]. Stefanelli did not have any discussions

with hospital staff beyond this, and the Defendant Officers never personally interacted with any DCF workers at the hospital. [Doc. No. 50 ¶¶ 40–44].

After an initial examination was conducted, Plaintiff was taken to a second examination room that was guarded by a MWH employee. [*Id.* at ¶ 45]. Around this time, an emergency room doctor determined Plaintiff needed further in-patient care and admitted her involuntarily pursuant to Section 12(a). [*Id.* at ¶¶ 45–46; Doc. No. 48-15 at 1]. Approximately four hours after that determination, DCF arrived and took custody of Plaintiff's baby. [Doc. No. 48-8 at 17; Doc. No. 48-12 at 6; Doc No. 50 at ¶ 50]. Though reluctant to part with her child, Plaintiff willingly handed her son to DCF. *See* [Doc. No. 48-8 at 18] ("A. [DCF] had thought if I was upset talking about [my husband], it would impact [my son]. I do not necessarily agree with these comments, but that is how they put it. Q. So you allowed the individual to take [your son] from you? A. Yeah, I guess so, if you can call being – yeah . . ."). According to the DCF report, Plaintiff's father agreed to take on primary care duties while Plaintiff was in the hospital. *See* [Doc. No. 48-13 at 9].

According to the application for authorization of Plaintiff's temporary involuntary commitment, the identified applicant is MWH physician Dr. Shannon Bottari, not any of the Defendant Officers. *See* [Doc. No. 48-15 at 1]. The application cites as evidence of Plaintiff's mental illness that the Defendant Officers suspected Plaintiff was suffering "paranoid delusions" and that Plaintiff was allegedly barricading herself in her room. [*Id.*]. Plaintiff was hospitalized for a period of approximately three days: from June 14 to June 17, 2020. [Doc. No. 48-16]. Plaintiff was diagnosed with postpartum psychosis during this stay. [Doc. No. 50 at ¶ 53]. Plaintiff alleges that her diagnosis is wrong because it was based, at least in part, on the flawed history that the Defendant Officers conveyed to the doctors. *See generally* [Doc. No. 58].

On June 17, 2020, Plaintiff's husband filed for a restraining order, citing Plaintiff's hospitalization as justification. [Doc No. 50 at ¶ 55; Doc. No. 48-12 at 8]. The Woburn District Court granted the restraining order thereby granting Plaintiff's husband temporary full custody of the child. [Doc. No. 50 at ¶ 56; Doc. No. 48-12 at 8].

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co*., 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)).

Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead "must present affirmative evidence." *Sterilite Corp. v. Olivet Intern'l Inc.*, 22-cv-10327, 2024 WL _____ (D. Mass. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)); *Bellone v. Southwick-Tolland Regional School District*, 748 F.3d 418, 424 (1st Cir. 2014). In

reviewing a summary judgment motion, a court may examine "all of the record materials on file" "including depositions, documents, electronically stored information, affidavits or declarations…or other materials." Fed. R. Civ. P. 56(c); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).

## IV.    DISCUSSION

Given Plaintiff's *pro se* status, I construe her challenges to Defendant's motion for summary judgment liberally. *See Jones v. Mitchell*, 2022 WL 3754846, at *1 (1st Cir. June 3, 2022) ("We construe liberally the challenges raised by Jones, who proceeds pro se on appeal."); *Miller v. Kopelman & Paige, P.C.*, 2008 WL 11388634, at *4 (D. Mass. Mar. 31, 2008) (citing *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997)) ("The pleadings of *pro se* litigants must be liberally construed…."); *but see id.* ("[P]ro se status does not insulate a party from complying with procedural and substantive law.").

### A.    Claims Against The Defendant Officers

Plaintiff alleges nine claims against the Defendant Officers: false imprisonment (Count One), excessive force (Count Two), abuse of process (Count Three), negligence (Count Five), negligent infliction of emotional distress (Count Seven), intentional infliction of emotional distress (Count Eight), loss of consortium (Count Nine), violations of the Massachusetts Civil Rights Act (Count Ten), and interference with the parent-child relationship (Count Eleven). *See generally* [Doc. No. 1-3]. Summary judgment of all nine claims is appropriate.

#### 1.    False Imprisonment (Count One)

Plaintiff brings a claim for false imprisonment on the basis that the Defendant Officers manipulated MWH staff into having her involuntarily and unlawfully committed. *See* [Doc. No. 1-3 at ¶ 82] ("Defendants acting under color of law, intentionally and unlawfully restrained the Plaintiff through trickery by having her present to the emergency department leading to her

unsubstantiated Section 12 confinement, thereby directly confining the Plaintiff against her will."); [Doc. No. 58 at 2] ("Defendant's intentionally and unlawfully restrained the Plaintiff through using their influence and authority under color of law, over the Plaintiff, the emergency department staff, and other local government actors leading to her unsubstantiated Section 12 confinement…."); [*id.* at 8] ("[T]he officers specifically requested of MWH staff that Plaintiff be held against her will….").

"[T]o succeed on a claim of false imprisonment, a party must show an intentional and unlawful confinement of a person, either directly or indirectly, of which the person confined is conscious or is harmed by such confinement." *See Mackey v. Town of Tewksbury*, 433 F. Supp. 3d 116, 167 (D. Mass. 2020) (citation and quotations omitted). Confinement can be imposed by physical barriers or physical force, but threats may also suffice so long as the actor "has the apparent intention and ability to apply force to the other's person immediately upon the other's attempting to escape from the area [of confinement]." *Steiner v. eBay, Inc.*, 21-cv-11181, 2025 WL 2318805, at *10 (D. Mass. Aug. 12, 2025) (citing *McCann v. Wal-Mart Stores, Inc.*, 210 F.3d 51, 53 (1st Cir. 2000)) (quoting Restatement (Second) of Torts § 40 & cmt. a); *Gallagher v. South Shore Hospital, Inc.*, 101 Mass. App. Ct. 807, 831–32 (2022) (citations omitted) ("To establish a claim for false imprisonment, a plaintiff must show that the defendant 'impos[ed] by force or threats an unlawful restraint upon freedom of movement.'"). "An actor has the requisite intent when 'his act was done for the purpose of imposing confinement upon the other or with knowledge that such confinement would, to a substantial certainty, result from it.'" *Steiner*, 2025 WL 2318805, at *10 (citation omitted).

Here, Defendants do not dispute that Plaintiff was involuntarily committed at MWH for several days. [Doc. No. 50 at ¶¶ 45–46, 51–52]. Instead, they argue that the claim fails because the

hospital, not the Defendant Officers, caused Plaintiff's confinement. *See* [Doc. No. 49 at 7] ("The psychiatric evaluation of the Plaintiff, which ultimately led to her involuntary hospitalization, was carried out by MWH staff… Defendants simply were not involved in making the determination to admit or prevent her from leaving MWH."). I agree that the hospital is responsible for implementing the Section 12 hospitalization.

Upon arriving at the hospital, Stefanelli helped Plaintiff check in her son, who was examined. [Doc. No. at ¶ 40]. After Plaintiff and her son went into an examination room, Stefanelli informed hospital staff that he was also concerned about Plaintiff's mental state. [*Id.* at ¶¶ 40–41]. He relayed what Plaintiff had shared with him during their initial phone conversation as well as conversations and observations from the home visit, and he informed the doctors of his suspicions of mental illness. [*Id.* at ¶¶ 42–43]. The Defendant Officers had no further contact with the hospital staff or Plaintiff and left. [*Id.* at ¶ 44; Doc. No. 48-8 at 16]. After the Defendant Officers left, Plaintiff was evaluated by MWH emergency room physician, Dr. Shannon Bottari, who moved to admit Plaintiff pursuant to Section 12(a). *See generally* [Doc. Nos. 48-14; Doc. No. 48-15 at 1]. Since Dr. Bottari examined and applied for Plaintiff's admission after the Defendant Officers had left the hospital, Plaintiff cannot say that the Defendant Officers are liable for her confinement.

But "a person can be liable for false imprisonment carried about by third parties if they engage in conduct that sets in motion a false imprisonment knowing that there was no lawful basis for the imprisonment." *Gallagher*, 101 Mass. App. Ct. at 832 (citation omitted) ("[I]f jury found that defendant . . . caused physician by false statements to request commitment of plaintiff . . . defendant would be liable…."). Therefore, I must also consider whether the Defendant Officers indirectly caused Plaintiff's confinement.

Here, it is clear that Dr. Bottari's decision to commit Plaintiff took the Defendant Officers' statements into account. On her application for involuntary hospitalization, Dr. Bottari cited as evidence of Plaintiff's potential mental illness that the Defendant Officers suspected that Plaintiff was experiencing paranoid delusions. [Doc. No. 48-15 at 1] ("? Paranoid delusions per police report – experience LT. police suspicious"). Her application also stated that Plaintiff was barricading herself in her room because she believed her husband was causing injury to their child and that her husband cuts "jigsaw" patterns into her fingernails. [*Id.*]. Additionally, Dr. Bottari's emergency room report states that the Defendant Officers "recommended to section 12" and that she agreed to admit them "based on their [summary of the Patient's] history and concern for the family's safety." [Doc. No. 48-14 at 1].

As an initial matter, that Dr. Bottari considered the Defendant Officer's concerns and assumed as true the facts as they were relayed to her does not mean that she supplanted her own medical judgment for that of the Defendant Officers'. It simply means that she agreed with their assessment, which she indicated in Plaintiff's medical records. [*Id.* at 1] ("They recommended to section 12, which I agreed to…."); *see* [Doc. No. 48-15 at 1] (checking box indicating she personally examined Plaintiff). In addition, Plaintiff does not dispute that either she or her husband made these statements to the Defendant Officers. *See* [Doc. No. 50 at ¶¶ 12–15]; *see generally* [Doc. No. 58] (failing to object to Defendants' statements of fact). Absent proof that the Defendant Officers relayed false statements to Dr. Bottari, let alone that they did so intentionally, Plaintiff cannot show that the Defendant Officers "engage[d] in conduct that sets in motion a false imprisonment knowing that there was no lawful basis for the imprisonment." *See Gallagher*, 101 Mass.App.Ct. at 832.

It is unclear whether Plaintiff alleges that she was falsely imprisoned during her drive to the hospital because she "drove her baby to the hospital at the Defendant Officers' request." [Doc. No. 58 at 8]; *see* [Doc. No. 1-3 at ¶ 82] ("Defendants… intentionally and unlawfully restrained the Plaintiff through trickery by having her present to the emergency department…."). Defendants argue that Plaintiff was not falsely imprisoned during her drive because there is no evidence that the Defendant Officers used or threatened to use force. *See* [Doc. No. 49 at 7]. I agree.

The record is clear that Plaintiff willingly complied with the Defendant Officers' suggestion to bring her son to the hospital because she believed this to be a necessary step in obtaining a restraining order against her husband and consequently agreed it was a good idea to get her son checked out. *See* [Doc. No. 50 at ¶¶37–39] ("They said … that it was required for me to take [my son] to the hospital if I was, in fact, concerned about my husband's behavior, and that was the only way to get a restraining order…."); [Doc. No. 48-8 at 14–15] ("Q. What did you do next when they said you should take the baby to the hospital; did you agree? A. Yes."); [Doc. No. 48-5 at 72] ("Q. It's fair to say that [Plaintiff] cooperated with you as far as deciding that she would go to [the hospital], she didn't resist? A. No. She cooperated in that she believed her newborn son was being evaluated."); *see also* [Doc. No. 50 at ¶¶ 37–39]. The Defendant Officers neither drove Plaintiff and her son to the hospital in their police cruisers nor called for an ambulance to transport them. *See* [Doc. No. 50 at ¶ 39]. Instead, Plaintiff drove her son in her personal vehicle, and the officers followed. *See* [Doc. No. 48-12 at 67] ("Q. [Plaintiff] went to the hospital voluntarily and did [the Defendant Officers] follow her? A. Yes."). Plaintiff does not cite, nor am I aware of, any evidence suggesting that the Defendant Officers used force, threats, or intimidation to compel an otherwise involuntary Plaintiff to appear at the hospital and there is also no evidence that the

Defendant Officers were prepared to use force to get Plaintiff to go to the hospital; by all accounts, Plaintiff traveled to MWH on her own accord, even if for a misinformed purpose.

Because Plaintiff cannot show that she was confined by the Defendant Officers, her claim for false imprisonment (Count One) fails. Accordingly, I need not address Plaintiff's allegations that her Section 12 hospitalization was improper.

### 2. Excessive Force (Count Two)

Turning to Plaintiff's claim for excessive force under 42 U.S.C. § 1983, at threshold, I must determine whether it should be analyzed under the Fourth Amendment or the Fourteenth Amendment. "To make out a Fourth Amendment excessive force claim, a plaintiff must show, as an initial matter, that there was a seizure within the meaning of the Fourth Amendment." *Conlon v. Scaltreto*, 2025 WL 2976531, at *3 (1st Cir. Oct. 22, 2025) (citation omitted). But where a person is subjected to force without being seized, the claim is analyzed as a substantive due process violation under the Fourteenth Amendment. See *generally County of Sacramento v. Lewis*, 523 U.S. 833 (1998). Plaintiff's claim fails under both the Fourth Amendment and the Fourteenth Amendment because there was no "seizure" and there was no "use of force."

The undisputed facts make plain that Plaintiff was not arrested, detained, restrained, or otherwise "seized" as traditionally understood under the Fourth Amendment. And as explained above, it was the hospital staff, not the Defendant Officers, who instituted Plaintiff's Section 12 confinement. Instead, Plaintiff alleges that "Defendants . . . used excessive and unreasonable force through coercion and trickery in the course of placing Plaintiff under a Section 12 . . . ," [Doc. No. 1-3 at ¶ 86], and that the Defendant Officers "were armed," [Doc. No. 58 at 8]. Plaintiff has not pointed to any authority, nor am I aware of any, that holds that coercion or trickery in similar circumstances as here may constitute a seizure within the meaning of the Fourth Amendment. Additionally, the fact that the officers were armed, standing alone, cannot constitute a use of force

such that an encounter turns into a seizure. *See U.S. v. Drayton*, 536 U.S. 194, 205 (2002) ("That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."). Plaintiff's claim for excessive force (Count Two) is dismissed.

### 3.    Abuse of Process (Count Three)

Count Three asserts a claim for abuse of process. [Doc. No. 1-3 at ¶¶ 89–96]. "The elements of an abuse of process claim are (1) the defendant used 'process' (2) for an ulterior or illegitimate purpose (3) resulting in damage." *Cabot v. Lewis*, 241 F. Supp. 3d 239, 259 (D. Mass. 2017) (quoting *Millenium Equity Holdings, LLC v. Mahlowitz*, 456 Mass. 627, 636 (2010)).

Defendants argue that this claim should be dismissed because "Plaintiff can identify no legal process which the Defendants effectuated as none of them has brought criminal charges or any lawsuit against the Plaintiff nor has Plaintiff identified any ulterior motive or illegitimate purpose. [Doc. No. 49 at 9–10]. Plaintiff refers to two types of legal processes in her complaint: involuntary admission to a hospital pursuant to Section 12 and obtaining a restraining order pursuant to M.G.L. ch. 209A. *See* [Doc. No. 1-3 at ¶¶ 89–96]. However, as explained above, the Defendant Officers did not initiate Plaintiff's Section 12 admission. Additionally, Plaintiff admits that her husband, not the Defendant Officers, applied for the 209A restraining order. [Doc. No. 1-3 at ¶ 93] ("By the Defendants initiating said [Section 12] process a third party, [husband], was able to utilize this to obtain an emergency restraining order against Plaintiff through the Woburn District Court and deprive her of her infant son who was placed in his care."). Plaintiff's abuse of process claim (Count Three) therefore must fail because she cannot show that the Defendant Officers used either of the legal processes she identified.

### 4.    Negligence (Count Five) And Negligent Infliction of Emotional Distress (Count Six)

Count Four asserts a claim for negligence on the basis that the Defendant Officers "breached the duty of reasonable care owed to Plaintiff when they negligently, carelessly, and recklessly falsely and unlawfully detained Plaintiff . . . [and] falsely imprisoned Plaintiff and subsequent abuse [sic] of process." [*Id.* at ¶¶ 105–09]. Count Six asserts a claim for negligent infliction of emotional distress based upon the same alleged breach of duty. *See* [*id.* at ¶¶ 118–24]. Because the Defendant Officers did not detain or imprison Plaintiff or abuse process, as previously explained, Count Four and Count Six both fail.

In her opposition, Plaintiff raises several new theories of negligence: that the Defendant Officers incompetently or maliciously obstructed Plaintiff's filing of a 209A restraining order and failed to investigate claims of physical assault. [Doc. No. 58 at 9]. A party cannot allege new theories of liability in an opposition to summary judgment. *See Estrada v. Progressive Direct Ins. Co.*, 53 F.Supp.3d 484, 497 (D. Mass. 2014) ("Plaintiffs cannot now introduce an entirely new theory of liability in their summary judgment papers.").

### 5.    Intentional Infliction of Emotional Distress (Count Eight)

Count Eight raises a claim for intentional infliction of emotional distress. *See* [Doc. No. 1-3 at ¶¶ 125–30]. To succeed on a claim for intentional infliction of emotional distress, "a plaintiff must show '(1) that the defendant intended to cause, or should have known that his conduct would case, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress. To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community.'" *Hellenga v. Controlled Risk Inc. Co. of Vermont, Inc.*, 85 Mass. App. Ct. 1111, 2014 WL 1302078, at *1 (2014) (citation

omitted). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Polay v. McMahon*, 468 Mass. 379, 386 (2014) (citation omitted).

As articulated in the complaint, Plaintiff's claim for intentional infliction of emotional distress merely alleges the elements of the claim without any recitation of facts in support of the claim. *See* [Doc. No. 1-3 at ¶¶ 125–30]. Defendants argue for dismissal of the claim on the basis that Plaintiffs' interactions with the Defendant Officers were "cordial" and "cooperative" and that "Plaintiff fails to show any instances of conduct that meet the threshold of extreme and outrageous." [Doc. No. 49 at 13–14]. In her opposition, Plaintiff alleges without citation to evidence that the Defendant Officers "repeatedly and falsely denied under oath actions clearly evidenced in medical and DCF records showing their intent to inappropriately separate a first-time nursing mother from her newborn baby indefinitely and against her will." [Doc. No. 58 at 9].

Plaintiff's response fails for multiple reasons. First, as explained above, hospital staff (and, under the same logic, DCF workers) independently determined that Plaintiff might have been suffering mental health issues, and the Defendant Officers therefore are not responsible for committing Plaintiff. Relatedly, DCF's decision to take the child was based on the physician's concerns for Plaintiff's mental health and not on the Defendant Officer's concerns. *See* [Doc. No. 48-13 at 6] ("We informed mother that this decision was not based on her parenting skills and only because there are concerns from the hospital about her mental health, we all agreed that she is a wonderful mother and will receive the help she needs before returning to her son."). Second, Plaintiff fails to cite any evidence to support her argument, a necessary requirement at the summary judgment stage. *See Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56) ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or

denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"). Third, even accepting Plaintiffs' allegations as true, Plaintiff cannot show that the Defendant Officers' conduct rises to the level of extreme or outrageous. Consequently, Plaintiff's claim for intentional infliction of emotional distress (Count Eight) is dismissed.

### 6.    Loss of Consortium (Count Nine)

Plaintiff raises a claim under M.G.L. ch. 231, § 85X for the loss of consortium of her son. *See* [Doc. No. 1 at ¶¶ 131–34; Doc. No. 58 at 6]. Section 85X provides parents with "a cause of action for the loss of consortium of the child who has been seriously injured against any person who is legally responsible for causing such injury." M.G.L. ch. 231, § 85X.

Defendants argue that this claim fails on the merits because Plaintiff has not provided any evidence whatsoever that her son sustained a serious injury, a required element of her loss of consortium claim. *See* [Doc. No. 49 at 14–15] (noting Plaintiff's "fail[ure] to supply any medical records, school records, or other psychotherapy records" indicating an injury to her child). I agree.

Plaintiff generically states in her complaint that the Defendant Officers "caused injury to Plaintiff's infant son," but she does not identify what those injuries might have been or explain how her son's injuries result in a loss of his society. *See* [Doc. No. 1-3 at ¶ 133]. Plaintiff then alleges in her opposition that her hospitalization and the Defendant Officers' "request[] that DCF take her newborn baby away from her" deprived her child of his "main source of sustenance at the time," but she does not explain why alternative sources of sustenance (such as formula) were insufficient or how this alleged deprivation caused the child serious harm. *See* [Doc. No. 58 at 9]. Such unsupported allegations are insufficient to create a dispute of material fact. *See Anderson*, 477 U.S. at 248 (quoting Fed. R. Civ. P. 56) ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"). And, in fact, the record

17

suggests that Plaintiff did breastfeed during at least a portion of her stay at MWH. *See* [Doc. No. 48-17 at 2] (Emergency Room Report Dated 06/14/2020: "[M]om was very cooperative and comfortably nursing her baby in her arms… [M]om is currently nurturing and breast-feeding her baby safely.").

In addition, as explained above, the hospital rather than the Defendant Officers are responsible for Plaintiff's involuntary commitment and DCF's decision to remove Plaintiff's child from her was based on the hospital's determination and not the Defendant Officers' concerns regarding Plaintiff's mental state. As a result, Plaintiff's claim for loss of consortium (Count Nine) is dismissed.

### 7. <u>Massachusetts Civil Rights Violations (Count Ten)</u>

Count Ten asserts a claim for violation of the Massachusetts Civil Rights Act ("MCRA") on the basis of racial discrimination. *See* [Doc. No. 1-3 at ¶¶ 135–40] ("Defendants… failed to provide bias free professional policing and Equal Protection under the Law… [and] intimidated, threatened, and/or coerced Plaintiff based on her race and ethnic background….").

To establish a claim under the MCRA, a plaintiff must prove that "(1) their exercise or enjoyment of rights secured by the Constitution or law of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation, or coercion.'" *Reproductive Rights Network v. President of Univ. of Mass.*, 45 Mass. App. Ct. 495, 505 (1998) (*quoting Swanset Dev. Corp. v. Taunton*, 423 Mass. 390, 395 (1996)). Defendants argue that the claim should be dismissed because, among other reasons, Plaintiff cannot show that she was threatened, intimidated, or coerced within the meaning of the MCRA. [Doc. No. 49 at 15–17].

A threat under the MCRA requires "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Reprod. Rights Network*, 45 Mass. App. Ct. at 505.

Similarly, intimidation requires "putting in fear for the purpose of compelling or deterring conduct." *Id.* Plaintiff does not specifically allege how the Defendant Officers might have caused her to become fearful, and the record does not support such a claim. *See* [Doc. No. 49 at 16] (describing interaction between Plaintiff and Defendant Officers as "cordial"); *see generally* [Doc. Nos. 1-3, 58]. Plaintiff's suspicions and fears regarding her husband existed before Plaintiff met the Defendant Officers and were the reason she originally sought help. Therefore, it cannot be said that the Defendant Officers caused those fears, let alone that they did so intentionally or for the purpose of compelling certain conduct.

It also cannot be said that Plaintiff was coerced into going to the hospital. Coercion under the MCRA requires "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Reprod. Rights Network*, 45 Mass.App.Ct. at 505. Here, the Defendant Officers recommended that Plaintiff's son get examined by a medical professional, and Plaintiff agreed that was in his best interest and brought him to the hospital. *See* [Doc. No. 48-8 at 13–15] ("Q. And did you understand that they were concerned about the wellbeing of the baby? A. Yes. That was a shared concern, I suppose. Q. Shared by you and by the police officers? A. Correct… Q. What did you do next when they said you should take the baby to the hospital; did you agree? A. Yes."). Even if Plaintiff was, in fact, "tricked" as she alleges, there is still no evidence that she was forced to bring her son to the hospital for a wellness check against her will. As discussed above, there was no use of force and, by all accounts, she consistently sought to protect her child in the ways she thought best, e.g., by limiting and supervising her husband's visits with their child and requesting legal help, and there is no evidence she would have been unwilling to get her son examined absent police intervention.

To the extent Plaintiff alleges that she was involuntarily hospitalized as a result of her race, the argument fails because, as previously explained, the Defendant Officers are not responsible for Plaintiff's involuntary hospitalization and because there is no evidence, only conclusory statements, of racial discrimination. *See* [Doc. No. 1-3 at 136] (stating Defendants "unlawfully caus[ed] the detainment… thereby depriving Plaintiff of her … liberty and to be free form [sic] unreasonable searches and seizures").

Because Plaintiff cannot show that her rights were interfered with through "threats, intimidation, or coercion," her claim alleging a violation of the MCRA (Count Ten) fails.

### 8. Interference With Parent-Child Relationship (Count Eleven)

Plaintiff's claim for intentional interference with the parent-child relationship alleges the Defendant Officers tricked her into bringing her son to the hospital with the intention of having DCF remove him from her care. [Doc. No. 1-3 at ¶¶ 141–47] ("When Defendants induced Plaintiff to present to the emergency department with her infant son, they intended to have the Department of Children and Families remove him from her care."). Defendants argue that this claim should be dismissed because there is no evidence the Defendant Officers intended to separate Plaintiff from her child and because they "played no other role in Plaintiff's child being removed from her custody." *See* [Doc. No. 49 at 17–18].

The tort of intentional interference with the parent-child relationship is intended to grant redress for a loss of filial consortium that results from "abduction, enticement, and harboring and secreting of minor children from their parents." *Murphy v. I.S.K. Con. Of New England, Inc.*, 409 Mass. 842, 860 (1991). To succeed on a claim for abduction, a plaintiff must show "the physical taking of a minor child from the parent having legal custody." *Id.* (citation omitted). "An action for enticement will lie where one, through an 'active and wrongful effort' and knowing that the parent does not consent, induced a child to leave the parent's home." *Id.* (citation omitted). "One

'harbors' a minor child by inducing or encouraging a child, who is away from the parent without the parent's consent, to remain away from the parent." *Id.* (citation omitted).

Defendants admit that the Defendant Officers informed DCF of their concerns over Plaintiff's mental state and encouraged her to go to the hospital to get her son evaluated, and they also admit that these incidents "ultimately led to Plaintiff being temporarily separated from her child." [Doc. No. 49 at 17–18]. But Plaintiff cannot show that the Defendant Officers abducted, enticed, or concealed Plaintiff's infant son. It is undisputed that Plaintiff was still in physical custody of her son when the Defendant Officers left the hospital, and, as explained above, the hospital staff and DCF workers independently determined that Plaintiff was experiencing mental health issues. *See* [Doc. No. 50 at ¶¶ 40–44]. Therefore, Plaintiff cannot establish that the Defendant Officers removed her son through a physical taking or inducement. Accordingly, Plaintiff's claim for intentional interference with the parent-child relationship (Count Eleven) fails.

### 9.    Qualified Immunity

I need not address Defendants' argument that the claims against the Defendant Officers are barred by the doctrine of qualified immunity because Plaintiff's claims have been properly dismissed on the merits.

### B.    Claims Against The Town

Plaintiff alleges two claims against the Town: negligence (Count Four) and negligent infliction of emotional distress (Count Six). [Doc. No. 1-3 at ¶¶ 97–104, 110–17]. Summary judgment of both claims is warranted.

### 1.    Negligence (Count Four)

Count Four raises a claim for negligence. [*Id.* at ¶¶ 97–104]. Defendants argue that the claim should be dismissed because it is barred by numerous provisions within M.G.L. ch. 258, § 10. *See* [Doc. No. 49 at 10–11] (arguing that Count Four is barred by subsections 10(b), 10(h), and

10(j)). In her opposition, Plaintiff does not dispute this argument and instead argues that the doctrine of comparative negligence does not preclude liability. *See* [Doc. No. 58 at 9].

Plaintiff's claim is barred because it falls within the discretionary acts exemption to the Massachusetts Tort Claims provided in M.G.L. ch. 258, § 10(b). Subsection 10(b) exempts from liability "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the party of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." M.G.L. ch. 258, § 10(b). Plaintiff alleges that the Town breached its duty of reasonable care when it "failed to handle, address, and/or otherwise properly investigate Plaintiff's complaints regarding [her husband]." [Doc. No. 1-3 at ¶ 99]. Courts have long held that "[d]ecisions regarding when, when, how, and whom to investigate… are discretionary and fall within the discretionary functions exception." [Doc. No. 49 at 11] (quoting *Sena v. Commonwealth*, 417 Mass. 250, 257 (1994)). Thus, any claims based on the manner in which the Defendant Officers investigated Plaintiff's allegations against her husband are barred by subsection 10(b).

### 2.    Negligent Infliction Of Emotional Distress (Count Six)

Defendants move for summary judgment of Count Six based on a misunderstanding that the cause of action alleges intentional infliction of emotional distress. *See* [Doc. No. 49 at 13] ("The Plaintiff's Claim of Intentional Infliction of Emotional Distress (Count VI) Against the Town Fails as a Matter of Law"). Defendants' argument that municipalities are not liable for the intentional torts of their employees is therefore irrelevant because the cause of action is for negligent, not intentional, infliction of emotional distress. [Doc. No. 1-3 at ¶¶ 110–17]. Nevertheless, because Count Six is based on the same alleged breach of duty as Count Four, it is denied for the same reasons that Count Four is denied. *See* [*id.* at ¶ 112] ("Defendant Stoneham

breached its duty of reasonable care to the Plaintiff when it… failed to handle, address, and/or otherwise properly investigate Plaintiff's complaints regarding [her husband].").

## V.    CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment, [Doc. No. 48], is <u>GRANTED</u>.


SO ORDERED.

                                        /s/ Myong J. Joun
                                        United States District Judge